IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UTAH HOUSING CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>COUNTRY PINES, LTD., a Utah limited partnership; COUNTRY PINES PHASE II, LLC, a Utah limited liability company; COREY L. ERICKSEN, an individual; and SHANE ERICKSEN, an individual,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DISMISSING ACTION FOR LACK OF SUBJECT MATTER JURISDICTION**<br><br>Case No. 2:17-cv-705<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Plaintiff Utah Housing Corporation sued Defendants Country Pines Limited, Country Pines Phase II, LLC, Corey L. Ericksen, and Shane Ericksen. Because both Country Pines entities are owned by the two individual Defendants, and because neither the differences between the two entities nor the differences between the entities and their owners are material to the court's analysis, it will refer to both entities and the individual Defendants, collectively, as "Country Pines." Utah Housing asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. *See* Dkt. No. 2 ¶¶ 36–70 ("Compl."). Utah Housing also asserted a claim styled "declaratory judgment." *Id.* ¶¶ 71–75. Country Pines subsequently asserted counterclaims for breach of contract and failure of consideration, detrimental reliance/promissory estoppel, negligent misrepresentation, violation of the implied covenant of good faith and fair dealing, and impossibility/impracticability. *See* Dkt. No. 19 at 23–29.

Utah Housing moves for summary judgment on its own claims, judgment on the pleadings on the counterclaims, and sanctions against Country Pines for willful failure to comply

with discovery obligations. *See* Dkt. Nos. 86, 87, 88. Country Pines moves for summary judgment on all of the claims and counterclaims. *See* Dkt. No. 90.

The court concludes that it lacks subject matter jurisdiction. It accordingly dismisses this action without prejudice.

## I.

The following background information is drawn from legal sources, the pleadings and attached exhibits (including agreements between the parties), and subsequent motions and briefing. *See* Dkt. Nos. 2, 2-1, 2-2, 2-3, 19, 90, 119, 120, 121, 123. The facts material to the court's analysis are not disputed.

## A.

Section 42 of the Internal Revenue Code, 26 U.S.C. § 42, establishes the Low-Income Housing Tax Credit program "to encourage individual and corporate investors to invest in the development, acquisition, and rehabilitation of affordable rental housing." Dkt. No. 2-1 at 2–3. This program provides "an indirect federal subsidy" that "allows investors to claim tax credits on their federal income tax returns." Compl. ¶ 11 (quoting Dkt. No. 2-1).

Under Section 42, an investor is not eligible for tax credits unless certain requirements are satisfied. First, no tax credit "shall be allowed" for any given year "unless an extended low-income housing commitment is in effect as of the end of such taxable year." 26 U.S.C. § 42(h)(6)(A). An "extended low-income housing commitment" is "any agreement between the taxpayer and the housing credit agency" that, *inter alia*, requires the recipient to maintain a fixed percentage of the housing project devoted to low-income units and prohibits the eviction of low-income tenants or unauthorized rent increases. *Id.* § 42(h)(6)(B).

Second, "the housing credit dollar amount with respect to any building shall be zero unless . . . such amount was allocated pursuant to a qualified allocation plan of the housing credit agency." *Id.* § 42(m)(1)(A). "Housing credit agencies" are generally state agencies charged with awarding low-income housing tax credits to project investors. *See* Compl. ¶ 13; *cf.* 26 U.S.C. § 42(h)(8)(A). A "qualified allocation plan" is "any plan" that, *inter alia*, "sets forth selection criteria to be used to determine housing priorities of the housing credit agency which are appropriate to local conditions" and "gives preference in allocating housing credit dollar amounts among selected projects" such as "projects serving the lowest income tenants" or "projects obligated to serve qualified tenants for the longest periods." 26 U.S.C. § 42(m)(1)(B). In addition, a "qualified allocation plan" must "provide[] a procedure that the agency . . . will follow in monitoring for noncompliance with the provisions of this section and in notifying the Internal Revenue Service of such noncompliance which such agency becomes aware of." *Id.*

Section 42 provides both federal and state enforcement mechanisms. During the "compliance period"—the first 15 tax years after the credit is awarded—the statute authorizes enforcement by the IRS through the recapture of tax credits. *See id.* § 42(i)–(j). And during the "extended use period"—a period "beginning on the 1st day in the compliance period" and ending at least "15 years after the close of the compliance period" or longer as agreed between the housing credit agency and the taxpayer—the statute contemplates enforcement through an "extended low-income housing commitment," which must be "recorded pursuant to State law as a restrictive covenant," and may be enforced "in any State court" by "individuals who meet the income limitation applicable to the building." *Id.* § 42(h)(6)(B), (D).

**B**.

Utah Housing, a public corporation created by the Utah Housing Corporation Act, is "the housing credit agency for the State of Utah." Compl. ¶¶ 1–2, 14. Country Pines entered into separate contracts with Utah Housing to build two qualified low-income housing projects. *See id.* ¶¶ 20–27. These contracts, which the parties call "the 1993 LURA" and the "1998 LURA," respectively, refer to Utah Housing as "the Agency" and to Country Pines as "the Project Owner." *See* Dkt. No. 2-2 ("1993 LURA") at 1; Dkt No. 2-3 ("1998 LURA") at 1.

The parties entered into the first agreement on November 30, 1993. *See* Compl. ¶ 20; 1993 LURA at 1. This agreement provides "that for each taxable year in the extended use period, as defined in IRC § 42, 100% of the residential units in the Project shall be both rent restricted, as defined in § 42, and occupied by individuals (hereinafter 'low-income tenants') whose income is 60% or less of the area median gross income for the county in which the Project is located." 1993 LURA ¶ 2.

The parties agreed "that all units of the Project will be leased . . . for a maximum monthly rental fee" to be calculated using a specific methodology set out in the agreement. *Id.* ¶ 13. The agreement further provides that the "maximum monthly rental fee amount shall include an allowance for tenant-paid utilities as provided in IRC § 42 or notices, regulations or revenue rulings issued or promulgated thereunder." *Id.* The parties agreed, however, that "upon written approval from" Utah Housing, Country Pines "may increase the maximum monthly rental fee for any unit of the Project, but not in excess of the rent ceiling levels established under IRC § 42, in an amount agreed to by the Agency, as the Agency shall decide in its sole discretion." *Id.*

In addition, Country Pines agreed "to comply with the obligations, terms and conditions of the Agency's Compliance Monitoring Plan." *Id.* ¶ 7. The agreement also provides that "[a]s a

4

condition to leasing a low-income unit, a low-income tenant shall be required to provide sufficient documentation to substantiate income levels of all individuals residing therein," *id.*, that Country Pines "shall permit, during normal business hours, upon reasonable notice, any duly authorized representative of the Agency to inspect any books and records of Project Owner relating to the Project and the incomes of low-income tenants," and that Country Pines "shall make available to the Agency the documentation substantiating incomes of low-income tenants," *id.* ¶ 8.

> The agreement states that
>
> [t]he Project Owner intends, declares and covenants that the covenants, terms, provisions and restrictions set forth in this Agreement shall run with the land and shall bind, and the benefits and burdens shall inure to, Project Owner and the Agency, and their respective successors and assigns, and all subsequent owners of the Project or any interest therein, for the duration of the extended use period.

*Id.* ¶ 14; *see also id.* ¶ 9 (providing that the extended use period will begin "on the first day in the compliance period" and end "on the date which is 15 years after the compliance period (for a total of 30 years)"); *id.* at 2–3 (declaring that "the regulatory and restrictive covenants set forth herein governing the use, occupancy and transfer of the Project shall be and are covenants running with the land for the term stated herein and binding upon all subsequent owners of the Project for such term set forth herein, and are not merely personal covenants of the Project Owner."). It further provides that the agreement "shall be placed of record in the real property records of the County in which the Project is located." *Id.* ¶ 15. The parties also "acknowledge[d] and agree[d] that any individual who meets the income limitations applicable to the Project under IRC § 42(g) (whether a prospective, present, or former occupant of the Project) has the right to enforce in any Utah state court the requirements and conditions of this Agreement." *Id.* ¶ 16.

Finally, the agreement states that it "shall be governed by and construed in accordance with the laws of the State of Utah, and where applicable, the laws of the United States of

America." *Id.* ¶ 19. The agreement generally makes clear which provisions are governed by federal law. For example, it provides that "[a]ll words, definitions and terms used in this Agreement that are defined or set forth in IRC § 42 shall have the meanings given in said IRC § 42." *Id.* ¶ 21. And it generally indicates expressly which terms and phrases are "as defined in IRC § 42." *Id.* ¶¶ 1, 2, 9.

The parties entered the second agreement on December 21, 1998. *See* Compl. ¶ 25; 1998 LURA at 1. The terms of this agreement largely track those of the first agreement. *See* Compl. ¶ 26.

Unlike the 1993 LURA, the 1998 LURA provides that 90.48% (as opposed to 100%) of the residential units will be rent restricted. *See* 1998 LURA ¶ 2. Just like the 1993 LURA, however, the 1998 LURA sets forth a specific methodology for calculating the "maximum monthly rental fee" (which includes an allowance for tenant-paid utilities) but provides that Country Pines may increase the maximum monthly rent with Utah Housing's approval so long as it does not exceed the rent ceiling levels established by Section 42. *See id.* ¶ 13. The 1998 LURA also imposes the same requirements that Country Pines comply with the "Compliance Monitoring Plan," *id.* ¶ 7, permit Utah Housing to "inspect any books and records . . . relating to the Project and the incomes of low-income tenants," and provide "documentation substantiating incomes of low-income tenants," *id.* ¶ 8.

Like the previous agreement, the 1998 LURA provides that the "covenants, terms, provisions and restrictions set forth" in the agreement "shall run with the land" as "Restrictive Covenants" and be "placed of record in the real property records of the County in which the Project is located," *id.* ¶¶ 14–15; *see also id.* at 2, and that third-party beneficiaries have "the right to enforce in any Utah state court the requirements and conditions of this Agreement," *id.* ¶

6

16. And it again provides that the agreement "shall be governed by and construed in accordance with the laws of the State of Utah, and where applicable, the laws of the United States of America," *id.* ¶ 20, specifically noting that "[a]ll words, definitions and terms used in this Agreement that are defined or set forth in IRC § 42 shall have the meanings given in IRC § 42," *id.* ¶ 27, and generally indicating expressly which phrases are in fact "defined in IRC § 42," *see id.* ¶¶ 1, 2, 9.

## C.

"Beginning at least as early as 2012, Country Pines stopped paying the annual Compliance Monitoring Fees for its two projects." Compl. ¶ 28. On February 7, 2017, "Utah Housing informed Country Pines of compliance violations, including failure to provide compliance documentation and a failure to pay Compliance Monitoring Fees." *Id.* ¶ 30. And "[a]t a February 13, 2017 meeting, Country Pines refused to provide Utah Housing with the documentation needed to demonstrate compliance with Section 42 and its related regulations, as well as compliance with the 1993 and 1998 LURAs." *Id.* ¶ 31.

Utah Housing alleges that Country Pines' "violations of Section 42, its regulations, and the 1993 and 1998 LURAs include but are not limited to":

A.   A failure to certify tenant incomes at move-in or to recertify income at appropriate intervals.

B.   The imposition of rents above gross rent LURA limits, including non-optional meals as a condition of occupancy, and up-front, non-refundable assessments fees.

C.   A refusal to provide required documentation during Utah Housing audits, including copies of any utility allowances used during the prior year and supporting documentation that covers the full compliance period under review (such as rent rolls).

*Id.* ¶ 32.

Utah Housing's claims for breach of the 1993 and 1998 LURAs are based on Country Pines' "failure to pay Compliance Monitoring Fees, failure to certify or recertify tenant incomes, imposition of rents (including mandatory meal and assessment charges) above gross rent LURA limits, and refusal to provide required documentation during Utah Housing Audits." *Id*. ¶ 38; *accord* ¶ 44. Utah Housing's claim for breach of the implied covenant of good faith and fair dealing is based on Country Pines' refusal to provide "requested compliance documentation." *Id*. ¶ 50; *see also id*. ¶¶ 51–52. Utah Housing's claim for unjust enrichment is based on Country Pines' refusal "to abide by the terms of the 1993 and 1998 LURAs or to comply with Section 42," *id.* ¶ 62, as well as its refusal to pay "compliance monitoring fees," *id*. ¶ 64. Finally, Utah Housing's claim for declaratory relief is based on Country Pines' violations of "Section 42 and 1993 and 1998 LURAs." *Id*. ¶ 72. "These violations include, but are not limited to, Country Pines' refusal to pay Compliance Monitoring Fees, its failure to certify or recertify tenant incomes, its imposition of impermissibly high rents (including mandatory meal and assessment charges), and its refusal to provide required documentation demonstrating compliance." *Id*.

Country Pines does not dispute that it is not complying with the LURAs. To the contrary, it represents that it was non-compliant as early as 1999, *see* Dkt. No. 90 at 21–22, and "reached 100% noncompliance by 2008," *id*. at 30. Indeed, it raises various affirmative defenses, such as statute of limitations, waiver, estoppel, and laches, based on Utah Housing's supposed acquiescence in Country Pines' noncompliance or at least its delay in seeking to enforce the agreements. *See* Dkt. No. 19 at 10–19. Country Pines also asserts various counterclaims. *See supra* p. 1; *see also* Dkt. No. 19 at 23–29.

**D.**

Utah Housing alleges that the court has federal question jurisdiction over this action under 28 U.S.C. § 1331. Prior to hearing argument on the parties' motions, the court entered an order noting that "Plaintiff's claims appear to be state law causes of action" and directing the parties to submit supplemental briefs addressing whether the court has subject matter jurisdiction over this action. Dkt. No. 119. Country Pines did not take a position regarding the court's jurisdiction, instead observing "that Plaintiff bears the burden of establishing jurisdiction" and indicating willingness "to defer to the good judgment of the Court." Dkt. No. 120 at 3. Utah Housing argued that the court has subject matter jurisdiction under 28 U.S.C. § 1331 because (1) its claims implicate substantial questions of federal law, and (2) its causes of action arise under federal law because the LURAs are "creations of federal law." Dkt. No. 121 at 5, 11. The court permitted Utah Housing to submit a second supplemental brief after the hearing, in which it listed the federal statutes and regulations allegedly implicated by its claims. *See* Dkt. No. 123.

**II.**

Under 28 U.S.C. § 1331, this court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." "A case can 'arise under' federal law in two ways." *Gunn v. Minton*, 568 U.S. 251, 257 (2013) (cleaned up).

First, "a case arises under federal law when federal law creates the cause of action asserted," for in almost all cases "a suit arises under the law that creates the cause of action." *Id.* (quoting *American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916)) (cleaned up). "As a rule of inclusion, this 'creation' test admits of only extremely rare exceptions and accounts for the vast bulk of suits that arise under federal law." *Id.* (cleaned up).

"But even where a claim finds its origins in state rather than federal law," the Supreme Court has, under what is often called the "substantial federal question" doctrine, "identified a 'special and small category' of cases in which arising under jurisdiction still lies." *Id.* at 258 (citation omitted). Specifically, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.*

## III.

In this case, Utah Housing does not assert any cause of action expressly created by federal law. Rather, it asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. These are hornbook examples of state law causes of action.[1] Utah Housing nevertheless argues that its claims implicate important issues of

---

[1] To be sure, in its fifth claim for relief, Utah Housing requests a declaratory judgment, a remedy authorized by the federal Declaratory Judgment Act. *See* 28 U.S.C. § 2201. But "the operation of [this] Act is procedural only," and a declaratory judgment is a remedy, not an independent cause of action. *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937). In adopting this Act, "Congress enlarged the range of remedies available in the federal courts" by allowing "relief to be given by way of recognizing the plaintiff's right even though no immediate enforcement of it was asked," but it "did not extend [the court's] jurisdiction." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950). A declaratory judgment may thus issue only "if the requisites of jurisdiction, in the sense of a federal right or diversity, provide[] foundation for resort to the federal courts." *Id.* at 671. Thus, for federal question jurisdiction to extend to a declaratory judgment action, the "claim itself must present a federal question." *Id.* at 672. And to determine whether this is so, the court looks to how the claim would arise in the absence of a declaratory remedy. *See id.* at 672–74.

Here, Utah Housing seeks "a declaratory judgment providing that Country Pines is not compliant with the 1993 or 1998 LURAs or with Section 42 and a declaratory judgment ordering Country Pines to comply with its covenants and obligations." Compl. ¶ 75. But Utah Housing's claim for declaratory relief is based on the exact same alleged acts and omissions on which its state law claims are based. *See supra* Part I.C. These state law claims thus show how the claim would be brought in absence of the declaratory judgment remedy, and the fact that Utah Housing's fifth claim for relief invokes the federal Declaratory Judgment Act accordingly adds nothing to the jurisdictional analysis.

federal law that are "necessarily raised, actually disputed, and substantial" and that this court thus has jurisdiction under the substantial federal question doctrine. Dkt. No. 121 at 5–6. For the reasons that follow, the court concludes that Utah Housing's claims do not necessarily raise any federal issue that is actually disputed. They thus "cannot be squeezed into the slim category" of state-law claims over which substantial federal question jurisdiction lies. *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 701 (2006).

## A.

Utah Housing argues that its claims necessarily raise federal issues because it "has sued Country Pines for failing to comply with the statutory and regulatory requirements of [the Low-Income Housing Tax Credit] federal program." Dkt. No. 121 at 8. As explained below, the court disagrees.

## 1.

At the outset, the court acknowledges Utah Housing's repeated allegations that Country Pines has violated Section 42. *See e.g.*, Compl. ¶¶ 32, 35, 72. But the court will not "accept as true legal conclusions couched as factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). Rather, the court must analyze the specific acts and omissions alleged to determine whether they in fact constitute violations of Section 42.

To be sure, Utah Housing alleges that Country Pines breached the LURAs and violated Section 42 in ways that "include, but are not limited to" the acts and omissions specifically set forth in the complaint. Compl. ¶¶ 32, 72. But the court declines to speculate what any additional unidentified violations might be and will instead focus only on the acts and omissions actually alleged. These acts and omissions are Country Pines' failure to pay compliance monitoring fees, its failure to provide requested compliance documentation during Utah Housing audits (including

11

documentation relating to utility allowances), its failure to certify or recertify tenant income, and its imposition of rents (including mandatory meal and assessment charges) above gross rent LURA limits. *See id.* ¶¶ 28, 30–32, 38, 44, 50–53, 63–65, 72.

Utah Housing has not established that any of these alleged acts and omissions actually violated Section 42 as opposed to simply breaching the LURAs. First, Section 42 imposes no requirement to pay compliance monitoring fees or to provide compliance documentation. Here, Utah Housing alleges that the compliance monitoring fees are required by the Compliance Monitoring Plan.[2] *See id.* ¶ 24 n.12. And the LURAs provide that the "Project Owner agrees to comply with the obligations, terms and conditions of the Agency's Compliance Monitoring Plan." 1993 LURA ¶ 7; *accord* 1998 LURA ¶ 7. Country Pines' obligation to pay compliance monitoring fees thus derives from the contracts, not from Section 42. It is likewise the LURAs, not Section 42, that provide that "a low-income tenant shall be required to provide sufficient documentation to substantiate income levels of all individuals residing therein," and that Country Pines "shall make available to the Agency the documentation substantiating incomes of low-income tenants." 1993 LURA ¶¶ 7–8; *accord* 1998 LURA ¶¶ 7–8.

Next, Section 42 imposes no requirement that a recipient of tax credits certify or recertify tenant income. Section 42 includes only two certification requirements, neither of which mandates annual certification or recertification of tenant income. First, Section 42 requires

---

[2] Although Utah Housing has not submitted a copy of the Compliance Monitoring Plan, the court presumes that such a plan exists and does require a compliance fee as stated in Complaint. *See* Compl. ¶ 24 n.12 ("As part of its Compliance Monitoring Plan, Utah Housing charges a Compliance Monitoring Fee, which is based on the number of Housing Credit Units in a project."). Furthermore, Country Pines has submitted a copy of the "Utah Housing Credit and Compliance Manual (UHCCM), 2019 version"—which may or may not be the same thing as the Compliance Monitoring Plan referred to in the LURAs—which provides that "Annual Compliance Monitoring fees" are "to be paid to [Utah Housing] for administering the Compliance Monitoring Plan." Dkt. No. 90-1 at 2, 287.

"[c]ertification with respect to 1st year of credit period." 26 U.S.C. § 42(l)(1). Under this requirement, the project owner must "certify to the Secretary" information such as "(A) the taxable year, and calendar year, in which such building was placed in service, (B) the adjusted basis and eligible basis of such building as of the close of the 1st year of the credit period, (C) the maximum applicable percentage and qualified basis permitted . . . , (D) the election made . . . , and (E) such other information as the Secretary may require." *Id.* This certification must be made "[f]ollowing the close of the 1st taxable year in the credit period with respect to any qualified low-income building." *Id.*[3] Second, Section 42 requires the project owner to "certify to the housing credit agency the full extent of all Federal, State, and local subsidies which apply (or which the taxpayer expects to apply) with respect to the building." *Id.* § 42(m)(2)(C)(ii).

Finally, Utah Housing specifically alleges that Country Pines imposed rents above gross rent *LURA* limits, not above the limits imposed by *Section 42*. *See* Compl. ¶¶ 38, 44. While Section 42 does impose rent limits, *see* 26 U.S.C. § 42(g)(2)(A), the 1993 and 1998 LURAs each specify how monthly rent is to be calculated without reference to or incorporation of Section 42, *see* 1993 LURA ¶ 13; 1998 LURA ¶ 13. It appears, moreover, that the rent limits imposed by the LURAs are lower than the limits imposed by Section 42. Indeed, after specifying how maximum monthly rents are to be calculated, the 1993 LURA provides that "[n]otwithstanding the foregoing, upon written approval from the Agency," and subject to the Agency's "sole discretion," Country Pines "may increase the maximum monthly rental fee for any of the Project, but not in excess of the rent ceiling levels established under IRC § 42." 1993 LURA ¶ 13. The

---

[3] The same section in the statute also identifies two specific "[a]nnual reports" that the "Secretary may require taxpayers to submit," but neither report involves certification or recertification of tenant income. 26 U.S.C. § 42(l)(2).

1998 LURA likewise specifies how maximum monthly rents are to be calculated and then

provides that

> [n]otwithstanding the foregoing, . . . the Project Owner may increase the
> maximum monthly rental fee or income limit applicable to tenants for any unit of
> the Project in an amount agreed to by the Agency, as the Agency shall decide in
> its sole discretion; however, under no circumstances may the maximum monthly
> rental fee or income limit applicable to tenants for any given unit of the Project
> exceed the rent or income limits established under IRC § 42.

1998 LURA ¶ 13. Utah Housing's allegations that Country Pines was charging excessive rent

thus turn on the LURAs, not Section 42.[4]

## 2.

To be sure, Country Pines' alleged acts and omissions may very well breach the LURAs.

But the LURAs make clear that they "shall be governed by and construed in accordance with the

laws of the State of Utah, and *where applicable*, the laws of the United States of America." 1993

LURA ¶ 19 (emphasis added); *accord* 1998 LURA ¶ 20. Here, it is clear that the laws of the

United States are not applicable to the provisions of the LURAs that Country Pines is alleged to

have breached.

First, as explained, none of Country Pines' alleged acts and omissions constitutes a

violation of Section 42. In addition, although the LURAs provide that "[a]ll words, definitions

---

[4] Because none of Country Pines' alleged acts or omissions appears to violate Section 42,
as opposed to simply breaching the LURAs, the allegations here are completely different from
those in *Riseboro*, where the court found that a breach of contract claim necessarily raised
substantial issues relating to interpretation of Section 42. *See Riseboro Community Partn. Inc. v.
SunAmerica Hous. Fund No. 682*, 401 F. Supp. 3d 367, 372 (E.D.N.Y. 2019). To resolve the
claims at issue in that case, the court was required to interpret a specific provision of Section 42
governing rights of first refusal (which the court called ROFRs) to determine "whether 26 U.S.C.
§ 42 contemplates any restrictions on an ROFR holder's ability to exercise it" and "whether 26
U.S.C. § 42(i)(7) envisions an ROFR that differs from a common law ROFR." *Id.* at 373. Here,
by contrast, Utah Housing's claims do not require the court to interpret Section 42 at all.

and terms used in this Agreement that are defined or set forth in IRC § 42 shall have the meanings given in said IRC § 42," 1993 LURA ¶ 21; 1998 LURA ¶ 27, none of the alleged breaches here turns on the meaning of any terms or phrases that are defined in Section 42. Indeed, as noted, the LURAs tend to call out explicitly which words are to be understood "as defined in IRC § 42." 1993 LURA ¶¶ 1, 2, 9 ("applicable fraction," "extended use period," "rent restricted," "compliance period," and "qualified contract"); 1998 LURA ¶¶ 1, 2, 9 (same, except for "qualified contract"). None of these phrases is included in the LURA provisions that Country Pines is alleged to have breached. Thus, none of the alleged breaches even implicates a definition contained in Section 42, much less turns on the interpretation of that statute.

The state law nature of the LURAs is underscored by the fact that the agreements expressly contemplate that they will be recorded in county "real property records" as "restrictive covenants" and will thus "run with the land" and "bind all subsequent owners of the Project or any interest therein." 1993 LURA at 2–3, ¶ 14, ¶ 15; *accord* 1998 LURA at 2, ¶¶ 14–15. In addition, to the extent the LURAs address the appropriate forum for judicial enforcement, they contemplate enforcement in "any Utah state court." 1993 LURA ¶ 16; *accord* 1998 LURA ¶ 16. Not only do the LURAs thus rely on state law, state courts, and state recording systems, they also appear intended to create property rights that run with the land. The rights and obligations established by the LURAs thus fall even more squarely within the type of rights usually governed by state law rather than federal law. *Cf. Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) ("Property interests, of course, are . . . created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.").

**3.**

Although Utah Housing has identified several federal issues that *could* be implicated by its claims, the court concludes that these claims do not *necessarily raise* any of these issues. As the Tenth Circuit has explained, "not every question of federal law lurking in the background or emerging necessarily places [a] suit in the class of one arising under the laws of the United States." *Andersen v. Bingham & G. Ry. Co.*, 169 F.2d 328, 329 (10th Cir. 1948).

First, with respect to the allegation that Country Pines charges tenants higher rent than is permitted under the LURAs, Utah Housing points out that federal law requires that mandatory meal and assessment charges be included in calculating gross rent. *See* 26 C.F.R. § 1.42-11(b)(3)(i). Indeed, the complaint pointedly alludes to this federal issue, alleging that Country Pines has imposed "rents above gross rent LURA limits, including non-optional meals as a condition of occupancy, and up-front, non-refundable assessments fees." Compl. ¶ 32.

The court concludes, however, that Utah Housing's claims do not "necessarily raise [this] stated federal issue" because this issue is not an "essential element" of any of Utah Housing's claims. *Grable & Sons Metal Products, Inc. v. Darue Engr. & Mfg.*, 545 U.S. 308, 314–15 (2005). Rather, it appears that Utah Housing raises this issue in anticipation of a potential defense. Specifically, it appears that Utah Housing was anticipating that Country Pines might argue that charges for services such as meals should not be counted as rent in determining whether it charges higher rent than the maximum permitted under the LURAs. And it appears that Utah Housing anticipated replying that if any of these services are non-optional, then federal law requires that they be included in calculating gross rent. *See* Dkt. No. 123 at 2.

A federal issue raised in anticipation of a defense, however, does not suffice to establish federal question jurisdiction. Rather, "[t]o determine whether an issue is 'necessarily' raised, the

Supreme Court has focused on whether the issue is an 'essential element' of a plaintiff's claim." *Gilmore v. Weatherford*, 694 F.3d 1160, 1173 (10th Cir. 2012). An issue raised in anticipation of a defense plainly is not such an element. More generally, because "the question whether a claim 'arises under' federal law must be determined by reference to the "well-pleaded complaint," it follows that "[a] defense that raises a federal question is inadequate to confer federal jurisdiction." *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 808 (1986). *A fortiori*, federal question jurisdiction cannot be premised on a federal issue raised in anticipation of a potential defense.

Next, in its second supplemental brief, Utah Housing identifies a regulation that appears related to the LURA requirement that Country Pines certify or recertify tenant income: namely, Treasury Regulation Section 1.42-5, which is styled "[m]onitoring compliance with low-income housing credit requirements." 26 C.F.R. § 1.42-5; *see also* Dkt. No. 123 at 2. As noted, under Section 42, tax credits cannot be awarded to investors unless they are "allocated pursuant to a qualified allocation plan of the housing credit agency." 26 U.S.C. § 42(m)(1)(A). A "qualified allocation plan" must satisfy certain requirements, including that it must "provide a procedure that the agency will follow in monitoring for noncompliance with the provisions of" Section 42. *Id.* § 42(m)(1)(B)(iii) (cleaned up).

Treasury regulation Section 1.42-5 sets forth "compliance monitoring procedures required of Agencies" under a qualified allocation plan. 26 C.F.R. § 1.42-5(a). Among other things, this regulation provides that "a procedure for monitoring for noncompliance under section 42(m)(1)(B)(iii) must include—(A) The recordkeeping and record retention provisions of paragraph (b) of this section; and (B) The certification and review provisions of paragraph (c) of this section." 26 C.F.R. § 1.42-5(a)(2) (cleaned up). The regulation makes clear, however, that

these provisions are not intended as a precise codification of requirements. Rather, "[a] monitoring procedure will meet the requirements of section 42(m)(1)(B)(iii) if it contains the substance of these provisions." *Id.* § 1.42-5(a)(2)(ii). "Under the recordkeeping provision, the owner of a low-income housing project must be required to keep records for each qualified low-income building in the project that show for each year in the compliance period documentation to support each low-income tenant's income certification." *Id.* § 1.42-5(b) (cleaned up). And "under the certification provision, the owner of a low-income housing project must be required to certify at least annually to the Agency that, for the preceding 12–month period, the owner has received an annual income certification from each low-income tenant, and documentation to support that certification." *Id.* § 1.42-5(c) (cleaned up).

The court finds that Utah Housing's claims do not necessarily raise the meaning or validity of Section 1.42-5 for a number of reasons. First, this regulation does not impose any obligations on tax credit recipients, such as Country Pines. Instead, it addresses only "compliance monitoring procedures required of Agencies." *Id.* § 1.42-5(a)(1). Even with respect to agencies, moreover, the regulation does not prescribe the precise content of their monitoring procedures; rather, it makes clear that agencies' compliance need only track the "substance" of the regulation and that the "particular order and form of the provisions in the allocation plan is not material." *Id.* § 1.42-5(a)(2)(ii). Not surprisingly, then, Utah Housing nowhere alleges a violation of Section 1.42-5 in the Complaint; rather, it alleges only specific breaches of the LURAs and unspecified violations of Section 42. Indeed, Section 1.42-5 is not even cited in the Complaint. Nor is Section 1.42-5 cited anywhere in the 1993 LURA. And while the 1998 LURA

cites other provisions of Section 1.42-5, *see* 1998 LURA ¶¶ 3, 8, it does not cite either the recordkeeping provisions (26 C.F.R. § 1.42-5(b)) or the certification provisions (*id.* § 1.42-5(c)).[5]

Presumably, the requirement that Country Pines certify and recertify tenant income is contained within the Compliance Monitoring Plan (which, again, Utah Housing has not provided), with which Country Pines agreed to comply as one of the terms of the LURAs. *See* 1993 LURA ¶ 7; 1998 LURA ¶ 7. While the content of the Compliance Monitoring Plan may be informed—at least in general substance though not necessarily in detail—by a federal regulation that does not itself govern Country Pines, the court concludes that any federal issue relating to the meaning and validity of the regulation (neither of which is disputed in this litigation) is simply too attenuated to support the conclusion that Utah Housing's claims fall within the "special and small category" of state-law claims over "which arising under jurisdiction . . . lies." *Gunn*, 568 U.S. at 258. Rather, any issues relating to the meaning or validity of the regulation are at most "question[s] of federal law lurking in the background" that do not suffice to bring Utah Housing's claims into "the class of one[s] arising under the laws of the United States." *Andersen*, 169 F.2d at 329.

Finally, Utah Housing points to Section 42 and Treasury Regulation 1.42-10, *see* Dkt. No. 123 at 2, both of which require that gross rent must include "any utility allowance determined by the Secretary," 26 U.S.C. § 42(g)(2)(B)(ii); *accord* 26 C.F.R. § 1.42-10(a). But Utah Housing does not allege that Country Pines is excluding utility allowances from gross rent

---

[5] The 1998 LURA states that "[a]s required by Income Tax Regulation § 1.42-5(e)(3), the Agency shall notify the IRS of any non-compliance with the provisions of IRC § 42, or of this Agreement, with which it becomes aware." 1998 LURA ¶ 8; *see also id.* ¶ 3 (same). Even here, the agreement thus requires that the IRS be notified only of non-compliance with Section 42 or the LURA itself; it does not mention, let alone require notification of, noncompliance with the regulation.

calculations. Rather, Utah Housing alleges that Country Pines "refus[ed] to provide required documentation during Utah Housing audits, including copies of any utility allowances used." Compl. ¶ 32. And neither Section 42 nor Treasury Regulation 1.42-10 imposes any documentation requirement relating to utility allowances. Instead, Country Pines' obligation to provide such documentation presumably arises from the Compliance Monitoring Plan, with which it agreed to comply as a term of the LURAs. *See* 1993 LURA ¶ 7; 1998 LURA ¶ 7.

Although Utah Housing has not invoked it, the court notes that Treasury Regulation Section 1.42-5, the regulation addressing the contents of compliance monitoring plans, arguably might be relevant to Utah Housing's allegations regarding utility allowances as well. This regulation instructs housing agencies that "the owner of a low-income housing project must be required to keep records" of "[t]he rent charged on each residential rental unit in the building (including any utility allowances)." 26 C.F.R. § 1.42-5(b). For all of the reasons discussed above, the court finds that any federal issue raised by this regulation is too attenuated to support federal question jurisdiction here. Indeed, any federal issue raised by this provision is even more oblique than any federal issues raised by the provisions regarding income certification. For here, the regulation speaks only to record keeping—not to certification or to providing documentation upon request. And Utah Housing has not alleged that Country Pines has failed to keep records of utility allowances—only that it has refused to provide them.

## B.

Even if Utah Housing's claims necessarily raised any of the federal issues discussed above, this court would still lack federal question jurisdiction under the substantial federal question test because none of these federal issues is actually disputed.

20

**1.**

An issue is "actually disputed" when "on the merits, it is the central point of dispute." *Gunn*, 568 U.S. at 259. At the outset, Utah Housing argues that "an 'actual dispute' must be inferred from the surface of the complaint—and not from an answer or from subsequent pleadings." Dkt. No. 121 at 6 (citing *Gilmore*, 694 F.3d at 1173). The court disagrees.

In its leading recent cases analyzing substantial federal question jurisdiction, the Supreme Court clearly looked beyond what could be inferred from the complaints to what was actually disputed in the litigation in determining whether federal issues were "actually disputed." Thus in *Gunn*, the Court concluded that "[t]he federal issue is also 'actually disputed' here—indeed, on the merits, it is the central point of dispute." 568 U.S. at 259. And in *Grable,* the Court likewise concluded that "the meaning of the federal statute is actually in dispute; it appears to be the only legal or factual issue contested in the case." 545 U.S. at 315.

Contrary to Utah Housing's contention, *see* Dkt. No. 121 at 6, the Tenth Circuit in *Gilmore* did not hold or suggest that whether an issue is actually disputed must be inferred from the complaint. To the contrary, when deciding whether "the federal issue of secretarial approval" in that case was actually disputed, the court looked to the federal defendants' brief, observed that "the Department of Interior has never made a definitive decision on [this precise] issue," and concluded that the private defendants "plainly disagree with the plaintiffs' contention that approval is necessary." *Gilmore*, 694 F.3d at 1173 (internal quotation omitted). To be sure, after concluding, based on the briefing, that the private defendants clearly disputed the plaintiffs' contentions regarding the federal issue of secretarial approval, the court did hold in the alternative that "[e]ven absent these statements [disputing the federal issue,] plaintiffs' allegations that the private defendants have been removing chat without approval from the

Secretary for years, if true, strongly suggests the private defendants do not deem secretarial approval to be required." *Id.*

But Utah Housing has not cited, and the court is not aware of, any precedent that *requires* the court to determine the "actually disputed" element based solely on the allegations in the complaint, or even precedent that allows a court to conclude that a federal issue is disputed based on the complaint where the parties' briefing and argument makes clear that the issue is not in fact disputed. Indeed, Utah Housing's contention that whether a federal issue is "actually disputed" must be determined solely based on the allegations in the complaint would conflate the "necessarily raised" and "actually disputed" elements of the substantial federal question test. The Supreme Court, however, has repeatedly treated these elements as distinct and independent requirements, each of which must be satisfied to establish jurisdiction under the substantial federal question doctrine. *See Gunn*, 568 U.S. at 259; *Grable*, 545 U.S. at 315.

**2**.

Here, none of the federal issues arguably implicated by Utah Housing's claims is actually disputed. Country Pines does not dispute the meaning or validity of Section 42, the treasury regulations, or any other federal law. For example, Country Pines does not dispute that mandatory meal and assessment charges as well as utility allowances must be included in gross rent calculations nor does it disagree with Utah Housing regarding the meaning of these requirements. Nor does Country Pines dispute the regulatory requirement that the Compliance Monitoring Plan must in substance require the certification and recertification of tenant income or disagree with Utah Housing regarding the meaning of this requirement. Indeed, although Utah Housing cited the treasury regulation imposing this requirement in its second supplemental brief

addressing the court's jurisdiction, this regulation was nowhere even cited, let alone disputed, in the parties' briefing on the motions before the court.

Even with respect to the alleged breaches of the LURAs, Country Pines does not actually dispute that it violated the terms of those agreements. *See* Dkt. No. 90 at 12–14. To the contrary, it argues that it was non-compliant as early as 1999, *see id.* at 21–22, and "reached 100% noncompliance by 2008," *id.* at 30.

The issues that are actually disputed are instead the numerous affirmative defenses and counterclaims raised by Country Pines, including issues of laches, waiver, estoppel, and statutes of limitation. *See* Dkt. No. 19 at 10–31. Even if these issues turned on federal law—and, for the most part, they do not[6]—it is well settled that a "defense that raises a federal question is inadequate to confer federal jurisdiction." *Merrell Dow*, 478 U.S. at 808. This is no less true of counterclaims: "a counterclaim—which appears as part of the defendant's answer, not as part of

---

[6] One exception is Country Pines' defense that, under Section 42, the "only consequence of" not complying with Section 42 or breaching the LURAs "is loss of tax benefits." Dkt. No. 19 at 18–19. But even if this defense raises a federal issue that is actually disputed, that issue is not "necessarily raised" *by Utah Housing's claims*. Nor is the federal issue "substantial." *Gunn*, 568 U.S. at 258. As explained, Utah Housing does not allege any acts or omissions that actually contravene Section 42, so this case does not require the court to determine what remedies might be available for a statutory violation. And it is clear enough that state law contract remedies are available for breaches of the LURAs. *See* 1993 LURA ¶ 19 (stating that the agreement "shall be governed by and construed in accordance with the laws of the State of Utah."); 1998 LURA ¶ 20 (same). In addition, in its briefing—but not its answer—Country Pines argues that the specific relief sought by Utah Housing would violate the Thirteenth Amendment's prohibition on involuntary servitude. *See* Dkt. No. 90 at 25–27. Again, this federal issue is a defense, not an essential element of Utah Housing's claims. And again, it is not substantial—because the agreements between Utah Housing and the Country Pines business entities are not personal service contracts, specific performance clearly does not implicate the Thirteenth Amendment. *See* William J. Rich, *Modern Constitutional Law* § 18:6 (3rd ed. 2020). ("As a generally accepted rule of contract law, orders for specific performance of non-delegable personal services violate public policy as represented by the Thirteenth Amendment.").

the plaintiff's complaint—cannot serve as the basis for 'arising under' jurisdiction." *Holmes Group, Inc. v. Vornado Air Circulation Systems, Inc.*, 535 U.S. 826, 831 (2002).

*     *     *

In short, because Utah Housing's claims do not necessarily raise any federal issues that are actually disputed, this case falls outside the "special and small category" of cases raising only state-law claims "in which arising under jurisdiction . . . lies." *Gunn*, 568 U.S. at 258.

## IV.

In the alternative, Utah Housing argues that jurisdiction is proper because "federal law creates the cause of action asserted." *Gunn*, 568 U.S. at 257. Although Utah Housing recognizes that 26 U.S.C. Section 42 does not create an express federal cause of action, it argues that "a cause of action may be *created* by federal law—even if the cause of action is a breach-of-contract claim—if federal law *requires* the agreement at issue and the agreement imposes duties consistent with the federal law at issue." Dkt. No. 121 at 11 (emphasis in original). Utah Housing argues that because Section 42 "*requires* that Utah Housing enter into LURAs with LIHTC [Low Income Housing Tax Credit] program participants, and those LURAs impose a duty to comply with federal LIHTC statutes and regulations," the LURAs at issue here are creatures of federal law and Utah Housing's claims for breach of the LURAs thus arise under federal law. *Id.* (emphasis in original).

While "[s]uits to enforce contracts contemplated by federal statutes *may* set forth federal claims," this is only sometimes true. *Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union, AFL-CIO-CLC*, 457 U.S. 15, 22 (1982) (emphasis added). To be sure, the Supreme Court has, "on several occasions . . . determined that a plaintiff stated a federal claim when he sued to vindicate contractual rights set forth by federal statutes, despite the fact that the

24

relevant statutes lacked express provisions creating federal causes of action." *Id.*; *see e.g.*, *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 18–19 (1979); *Norfolk & Western R. Co. v. Nemitz*, 404 U.S. 37, 42–45 (1971); *International Ass'n of Machinists, AFL-CIO v. Central Airlines, Inc.*, 372 U.S. 682, 695–96 (1963). More recently, however, the Court has held in other cases that suits to enforce contracts required or contemplated by other federal statutes do not state federal claims. *See, e.g., Empire*, 547 U.S. at 699; *Jackson Transit*, 457 U.S. at 29.

Although these various decisions are examples of when federal law does or does not create a cause of action to enforce contractual rights, they "do not dictate the result" in other cases. *Jackson Transit*, 457 U.S. at 22. Rather, whether a suit to enforce a contract contemplated or required by a federal statute arises under federal law turns on congressional intent: "in each case, 'the critical factor' in determining 'the scope of rights and remedies under a federal statute . . . is the congressional intent behind the particular provision at issue.'" *Empire*, 547 U.S. at 694–95 (quoting *Jackson Transit*, 457 U.S. at 22). If Congress intended that the contracts be "creations of federal law," then "the rights and duties contained in those contracts [are] federal in nature" and the "suit states federal claims." *Jackson Transit*, 457 U.S. at 23 (citation omitted). "Otherwise, the [suit] presents only state-law claims." *Id.*

In analyzing Congress's intent, the court must "begin with the language of the statute itself." *Id.* Section 42 plainly contemplates a mix of federal and state enforcement mechanisms, specifying where enforcement is committed to federal avenues and when it is not. For example, the statute contemplates federal enforcement by the IRS during the first 15 years through "recapture of credit." 26 U.S.C. § 42(i)–(j). This is the only reference to federal enforcement in Section 42. During the "extended use period," however, the statute contemplates enforcement through "extended low-income housing commitments"—"agreements between the taxpayers and

the housing credit agencies," such as the LURAs at issue here. *Id.* § 42(h)(6)(B) (cleaned up). Section 42 specifically mandates that an extended low-income housing commitment be "recorded pursuant to State law as a restrictive covenant." *Id.* § 42(h)(6)(B)(vi). As noted, "[p]roperty interests"—such as restrictive covenants that run with the land—are generally "created and . . . defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents of State Colleges*, 408 U.S. at 577. The court concludes that Section 42's references to state recording procedures and restrictive covenants thus clearly signal Congress's intent to treat extended low-income housing commitments as state law contracts. This conclusion is confirmed by Section 42's explicit provision that third-party beneficiaries may "enforce *in any State court* the requirements and prohibitions" of these agreements. 26 U.S.C. § 42(h)(6)(B)(ii) (emphasis added). This is the only reference to judicial enforcement in the statute. In light of these provisions, the court concludes that if Congress "found it necessary or proper to extend federal jurisdiction" to claims for breaches of extended low-income housing commitments, "it would have been easy enough for Congress to say so." *Empire*, 547 U.S. at 696; *cf. id.* at 696–701 (holding that the lack of an express cause of action to enforce certain contractual rights contemplated by a federal statute demonstrated that a claim to enforce these rights did not arise under federal law where the federal statute expressly provided that other contractual claims could be brought in federal court).

Finally, in contrast to those cases where the Supreme Court has found that Congress intended to create a federal cause of action to enforce contracts contemplated by federal statutes, the contractual rights that Utah Housing seeks to enforce in this case are not "contractual rights *set forth by federal statutes*." *Id.* at 694 (quoting *Jackson Transit*, 457 U.S. at 22; emphasis in *Empire*). To the contrary, as explained above, Country Pines' alleged acts and omissions do not

26

violate any provision of Section 42, nor does that statute prescribe the terms of the LURAs that these acts and omissions appear to breach. *See supra* Part III.A.1.

For all of these reasons, the court concludes that Congress did not intend to create a federal cause of action to enforce any and all claims for breaches of extended low-income housing commitments.[7]

## CONCLUSION

For the foregoing reasons, the court concludes that it lacks subject matter jurisdiction over Utah Housing's claims. This action is accordingly **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED**.

DATED this 24th day of May, 2021.

BY THE COURT:

_____
Howard C. Nielson, Jr.
United States District Judge

---

[7] Utah Housing also points to *AT&T Communications of Mountain States, Inc. v. Qwest Corp.* as "the pertinent case" where the court determined it had federal question jurisdiction over AT&T's breach-of-contract claims because "federal law created the cause of action." Dkt. No. 121 at 12 (quoting *AT&T*, 2:06-CV-00783, 2007 WL 518537, at *1 (D. Utah Feb. 13, 2007)). The court in *AT&T* in turn relied on *Verizon Maryland, Inc. v. Global NAPS, Inc.*, which held that federal question jurisdiction extended to an action seeking review of an order interpreting an interconnection agreement because the contract at issue and the adjustment board it established "are creations of federal law." 377 F.3d 355, 364 (4th Cir. 2004).

But in both cases, the contract claims at issue were governed by federal law. *See AT&T*, 2007 WL 518537 at *4 (explaining that the resolution of plaintiffs' claims "depends on the application and interpretation of federal law."); *Verizon*, 377 F.3d at 365 (4th Cir. 2004) ("[T]he resolution of [Verizon's contract] claim depends on the interpretation and application of federal law."). The provisions of the LURAs at issue in this case, by contrast, are governed by Utah law. *See supra* Part III.A.2.; 1993 LURA ¶ 19; 1998 LURA ¶ 20. Indeed, it is not entirely clear whether the courts in *AT&T* and *Verizon* found jurisdiction based on a federal cause of action or under the substantial federal question doctrine. Either way, these cases—neither of which is controlling—seem hardly as "pertinent" as Utah Housing argues.